UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
BELRON US, INC                             :
2400 Farmers Drive                         :
Columbus, Ohio 43235                       :
                                           :
        Plaintiff,                         :    Docket No. _____
                                           :
        vs.                                :
                                           :    **VERIFIED**
EDWARD LEE                                 :    **COMPLAINT**
35 Larch Court                             :
Fishkill, New York 12524                   :    JURY DEMAND
                                           :    ENDORSED HEREON
                                           :
        Defendants.                        :
-----------------------------------------------------------X    **JUDGE ROBINSON**

        Belron US, Inc. ("Belron" or the "Company"), by its attorneys, for its Verified

Complaint against Edward Lee ("Lee"), alleges as follows:

### Nature of the Action

        1.      Belron brings this action to prevent one of its former key employees,

Edward Lee, from disclosing Belron's trade secrets, from soliciting or attempting to solicit

current Belron employees, and from conspiring with others to do so in violation of contractual,

stautory, and/or common law obligations to Belron.

### Background Facts

        2.      Until recently, Lee was the Director of Retail Initiatives for Belron.  In

May 2006, Lee executed an "Employment Compensation Agreement and Agreement Not to

Compete, Solicit, and Disclose Confidential Information" ("Employment Agreement") under

which Lee committed not to start a competing business, work for a competitor, solicit current

customers or potential customers with whom he had contact, or solicit Belron's employees for

twelve months after his termination date.

16.    Upon information and belief, in or about January 2006, Diamond promoted Lee to Director of Retail Initiatives. A true and accurate copy of the letter to Lee outlining this new position is attached as Exhibit B and is incorporated herein by reference.

17.    As Diamond's Director of Retail Initiatives, Lee had nationwide responsibility for all of Diamond's advertising, marketing, branding, and fuel reduction initiatives. Lee was also part of Diamond's mergers and acquisitions team, for which he analyzed and evaluated potential acquisitions throughout the country and assisted in the implementation of any mergers and acquisitions. Moreover, Lee was responsible for implementing Diamond's strategic plan to capture market share by targeting its major competitors. *See* Exhibit B.

18.    Lee executed his Employment Agreement in May 2006 in return for a salary increase of $383.07 per week. A true and accurate copy of Lee's Employment Agreement is attached as Exhibit C. Upon information and belief, Lee received this salary increase as promised.

19.    Levesque was a long-time employee of Diamond who previously held the position of District Manager until November 2005. Levesque's responsibilities as District Manager included overseeing Diamond's operations in Massachusetts, and Levesque was instrumental in the growth and establishment of Diamond's business.

20.    In or about November 2005, Diamond promoted Levesque to Director of Best Practices – Operations. A true and accurate copy of the letter to Levesque outlining this new position is attached as Exhibit D and is incorporated herein by reference.

21.    As Diamond's Director of Best Practices – Operations, Levesque had nationwide responsibility for all of Diamond's field associate training and development

initiatives, as well as for enforcing compliance with company best practices policies and procedures.

22.    On April 1, 2008, Diamond filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. In re: Diamond Glass, Inc., et al., Case No. 08-10601 (CSS), at p. 4, ¶D (Bankr. D. Del. June 20, 2008). A true and accurate copy of the Bankruptcy Court's Order is attached as Exhibit E.

23.    The assets of Diamond were sold through the bankruptcy proceeding at auction on June 18, 2008. *See* Exhibit E, at p. 6, ¶J.

24.    The employment agreements of Diamond's employees, including the Lee Employment Agreement, were expressly included within the sale of Diamond's assets as "Designated Contracts." *See* Exhibit E, at p. 4, ¶E.

25.    The Bankruptcy Court found that "due and proper notice of the assumption, sale, and assignment of each executory contract…" had been provided. *See* Exhibit E, at p. 4, ¶E. The "executory contracts" are included within the Designated Contracts. Id. The Bankruptcy Court further found that "[a] reasonable opportunity to object or be heard" had been afforded to parties to those contracts, including to Lee. *See* Exhibit E, at p. 4, ¶F.

26.    The Bankruptcy Court found that "[t]he assumption and assignment of the Designated Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest thereof, and represents the exercise of sound and prudent business judgment by the Debtors." *See* Exhibit E, at p. 10, ¶V.

27.    The Bankruptcy Court held that "[t]he Designated Contracts are assignable notwithstanding any provision contained therein to the contrary." *See* Exhibit E, at

p. 10, ¶W.  The Bankruptcy Court ordered the Designated Contracts, which included Lee's

Employment Agreement, to be assigned to Belron pursuant to Belron's purchase of Diamond's

assets.  *See* Exhibit E, at p. 20, ¶22.

28.    Lee did not file any objection with the Bankruptcy Court to the assignment

of his Employment Agreement to the purchaser of Diamond's assets.

29.    Belron purchased Diamond's assets for approximately $50 million.

30.    After Belron purchased Diamond's assets, Lee maintained the same

position, duties, and responsibilities as Director of Retail Initiatives for Belron as when he had

worked for Diamond.

31.    After Belron purchased Diamond's assets, Levesque maintained the same

position, duties, and responsibilities as Director of Best Practices—Operations for Belron as

when she had worked for Diamond.

<u>**Lee's Employment Agreement**</u>

32.    Under the Lee Employment Agreement, Lee agreed to non-disclosure,

non-competition, and non-solicitation obligations.  Specifically, under Paragraph 4 of the

Agreement, Lee agreed not to disclose confidential information:

> The Associate shall not at any time, during or after the term of the
> Associate's employment by the Company, disclose, declare, or
> reveal to any person, or in any way use for Associate's own profit,
> gain, or benefit, all or any part of the Diamond Triumph System,
> which the Associate acknowledges for purposes hereof consists of
> all information regarding the business methods, systems,
> processes, business plans, customers, pricing, costs, sources of
> supply, and other information about the products, customers,
> suppliers, marketing plans and business of the Company.  It is
> understood and agreed, however, that the restrictions set forth in
> this section 4B shall not apply to any part of the Diamond Triumph
> System that was known to the Associate prior to his employment
> by the Company or that is or becomes generally known within the
> automotive replacement industry through no fault of the Associate.

- 6 -

*See* Exhibit D, at ¶4B.

33.     Lee further agreed that during his employment and for a twelve-month period after the termination of his employment, for any reason, he would not:

> (I) directly or indirectly, for himself or any other person or business entity, compete with the business of the Company; (II) become an employee of or perform services in any capacity for any person or business entity that competes with the business of the Company; (III) directly or indirectly have an ownership interest of any kind or any interest of any kind in the revenue or business entity which competes with the business, except that the provisions of this clause shall not be applicable to an investment by customary channels in stock that is publicly traded that does not exceed five percent (5%) of the total amount of such securities outstanding; (IV) do business with any customer of the Company, solicit, divert or attempt to divert from the Company any customer or business whatsoever; (V) call-on, solicit or contact any potential customer Associate called-on, solicited or contacted while employed with Company during the last twelve months of employment with Company; or (VI) solicit or attempt to solicit any associate of the Company or employ any person employed by the Company.

*See* Exhibit D, at ¶4A.

34.     Lee's Employment Agreement defines a "competing business" as one:

> engaged in any way in the business of selling, repairing or installing automobile or truck glass or windshields or other glass products, or selling and installing those kinds of automobile and truck accessories sold by the Company either during, at or after the time of the termination of the Associate's employment.

*See* Exhibit D, at ¶4A.

35.     Diamond used this form of employment agreement, or something substantially similar, for most, if not all, of its employees.

**Access to Trade Secrets**

36.    As a Regional Manager and as the Director of Retail Initiatives, Lee was given access to and received trade secret and other confidential and proprietary information about Diamond (and now Belron), such as information about marketing, distribution, pricing and other strategy, cost structure, strategic planning, possible mergers and acquisitions, fuel reduction initiatives, personnel information, and key client account information. Each of these categories of information is kept confidential by Belron, is confidential information under Lee's Employment Agreement, and involves information that is critical to Belron's ongoing business efforts. Having this information would provide a competitor with a substantial and unfair competitive advantage.

37.    As a District Manager and as the Director of Best Practices – Operations, Levesque was given access to and received trade secret and other confidential and proprietary information about Diamond (and now Belron), such as information about marketing, distribution, pricing and other strategy, cost structure, strategic planning, personnel information, and key client account information. Each of these categories of information is kept confidential by Belron and involves information that is critical to Belron's business efforts. Having this information would provide a competitor with a substantial and unfair competitive advantage.

38.    Upon information and belief, Diamond expended significant amounts of time, expense, and effort in developing its employees, client base, good will, and its relationships with its employees and clients. These are significant assets that Belron obtained through its purchase of Diamond's assets. Further, Belron has expended significant amounts of additional resources in developing its employees, client base, and good will, which Lee and Levesque

- 8 -

became privy to as Belron's Director of Retail Initiatives and Director of Best Practices, respectively.

### Solicitation of Current Belron Employees

39.     Upon information and belief, Lee and Levesque have engaged and continue to engage in a plan or scheme to open a competing vehicle glass business with Kenneth Levine (Diamond's former owner and an unsuccessful bidder for the company at the bankruptcy auction) in violation of Lee's Employment Agreement and in violation of Lee's duties of good faith, loyalty, and confidentiality.

40.     Upon information and belief, Lee and Levesque, together and/or in concert with Levine and/or others, and in furtherance of their plan to open a competing business venture, conspired to interfere with the contracts of key current employees of Belron by soliciting them and inducing them or attempting to induce them to breach their contractual obligations with Belron.

41.     Despite Lee's obligations under his Employment Agreement, while he was still employed by Belron in mid- to late July 2008, in furtherance of the conspiracy, he contacted current employees of Belron to solicit and encourage them to leave their employment and join with him, Levesque, and Levine in a competing business venture. Upon information and belief, these employees included David Dunn, Belron's Regional Director for the Northeast Region (the position formerly held by Lee) and Rob Roveto, the Regional Sales Manager for the Northeast.

42.     While she was still employed by Belron in mid- to late July 2008, in furtherance of the conspiracy with Lee, Levesque contacted current employees of Belron to solicit and encourage them to leave their employment and join with her, Levesque, and Levine in a competing business venture. Upon information and belief, these employees included Kristy

Oliveira and Maria Karalis, Assistant Sales Managers for territories in Massachusetts and Rhode Island.

43.    Upon information and belief, in furtherance of the conspiracy, Levesque called Oliveira and/or Karalis repeatedly on their personal phones to discuss with them her, Lee's, and Levine's plan to open a competing business venture and to invite them to join them in this venture.

44.    Upon information and belief, in furtherance of the conspiracy, Levesque told Karalis that the business would be operating in the New York, Connecticut, and Boston areas.

45.    Upon information and belief, in furtherance of the conspiracy, Lee and Levesque communicated with each other concerning their unlawful activities during the time they were soliciting Belron's employees.

46.    Lee and Levesque knew that some or all of the current Belron employees with whom they spoke had existing non-compete agreements with Diamond that had been assigned by the Bankruptcy Court to Belron.

47.    Upon information and belief, in the context of discussing her, Lee's, and Levine's plan for a competing business venture, and in furtherance of the conspiracy, Levesque asked Karalis and Oliveira to provide her with a copy of their non-compete agreements, and said there are "ways around" those agreements, or words to that effect.

48.    Upon information and belief, while still employed by Belron, Lee spoke with Dunn several times, both at work and at Dunn's home, and told him that he, Levesque, and Levine were starting a competing vehicle glass business. Lee told Dunn that he wanted him to be part of his team and asked him not to sign any agreement with Belron. Lee further informed

Dunn that they had obtained telephone numbers, a yellow pages listing, and six vans for this competing business, and had access to properties owned by Levine in New York and New Jersey that could be used to open up the business. Lee also told Dunn that "there were ways around" Dunn's non-compete agreement, or words to that effect.

49.    Upon information and belief, while still employed by Belron, Lee spoke with Roveto and told him that he, Levesque, and Levine were starting a competing vehicle glass business. Lee also encouraged Roveto not to sign any agreement with Belron. Lee told Roveto that his noncompete agreement was "not any good" and that "there were ways around" it, or words to that effect.

50.    In the context of his discussions with Roveto concerning the competing business venture with Levesque and Levine, Lee asked Roveto to tell him who his best sales people were.

51.    Key employees at Belron, like Lee and Roveto, received certain confidential financial information each month about Belron's business. Upon information and belief, in the context of conversations with Roveto about starting a competing business, Lee and/or Levesque asked Roveto to save that information because it would be helpful to them in their new business.

52.    Upon learning that Lee and Levesque had been actively soliciting current employees to establish a competing business, and in so doing violating their duties of good faith and loyalty and contractual obligations, Belron terminated Lee and Levesque for cause.

53.    Despite knowledge of his wrongful actions, upon information and belief, Lee has solicited Belron's employees, continues to solicit those employees, threatens to violate

his non-disclosure obligations, and has conspired and continues to conspire with Levesque to

solicit and threaten to violate his non-disclosure obligations.

54.    Lee's actions were undertaken with malice, insult and oppression, and

with a conscious disregard for the rights of Belron.

## COUNT ONE

### Preliminary and Permanent Injunction Against Lee

55.    Belron incorporates the allegations contained in paragraphs 1 through 54

as if fully rewritten.

56.    Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Belron is

entitled to temporary, preliminary and permanent injunctive relief, enjoining and restraining Lee

from violating the non-solicitation and non-disclosure provisions of the Lee Employment

Agreement, from interfering with Belron's contracts and employment relationships with its

current employees, and from misappropriating Belron's confidential or trade secret information.

## COUNT TWO

### Breach of Contract

57.    Belron incorporates the allegations contained in paragraphs 1 through 56

as if fully rewritten.

58.    Lee has breached the terms of his Employment Agreement by the conduct

described herein.

59.    Belron was not in breach of any of its obligations under the Employment

Agreement before the breaches by Lee.

60.    Belron terminated Lee for cause in connection with his actual and/or

threatened violations of the Lee Employment Agreement.

- 12 -

61.    If Lee is not enjoined from soliciting current employees of Belron and/or from using or disclosing Belron's trade secrets and other confidential proprietary information, Belron will suffer damages and be irreparably injured.

## COUNT THREE

### Misappropriation of Trade Secrets

62.    Belron incorporates the allegations contained in paragraphs 1 through 61 as if fully rewritten.

63.    Lee is using and/or disclosing and/or if permitted to begin work with or continue to work for a competitor will inevitably use and/or disclose Belron's trade secrets for his own benefit and the benefit of a competitor.

64.    Lee's conduct constitutes a misappropriation of Belron's trade secrets.

65.    As a result of Lee's misappropriation of Belron's trade secrets, Belron has and will continue to suffer damages and irreparable harm.

66.    In light of Lee's willful and malicious conduct, Belron is also entitled to recover punitive damages from him.

## COUNT FOUR

### Tortious Interference

67.    Belron incorporates the allegations contained in paragraphs 1 through 66 as if fully rewritten.

68.    Lee knows that Belron's employees, including the employees he has contacted and solicited regarding the competing business venture, have non-compete and other employment-related contractual agreements with Belron.

## COUNT FIVE

### Breach of Duty of Loyalty

76.     Belron incorporates the allegations contained in paragraphs 1 through 75 as if fully rewritten.

77.     As an employee, Lee owed Belron a duty of loyalty.

78.     Belron supplied Lee with confidential and trade secret information for Lee's use on Belron's behalf during his employment with Belron.

79.     While still employed by Belron, Lee actively sought to induce Belron's current employees to leave their employment with Belron and join him, Levesque, and Levine in a competing business venture in violation of Lee's Employment Agreement and in violation of the employees' noncompete agreements.

80.     Lee knows that Belron's employees have non-compete agreements.

81.     The actions of Lee as set forth herein breached his duty of loyalty to Belron.

82.     As a direct and proximate result of the breach of his duty of loyalty, Belron has been damaged by the amount of compensation it paid to Lee during his period of disloyalty.

## COUNT SIX

### Breach of Fiduciary Duty

83.     Belron incorporates the allegations contained in paragraphs 1 through 81 as if fully rewritten.

84.    During his employment with Belron as a Director-level employee entrusted with confidential information, trade secrets and customer and employee relationships, Lee owed Belron a fiduciary duty.

85.    Lee's actions in using or disclosing and/or threatening to use or disclose Belron's confidential information and in tortiously soliciting Belron's current employees to induce them to leave their employment with Belron and join him, Levesque, and Levine in a competing business venture violated Lee's duty of loyalty and his other obligations as a management-level employee.

86.    These violations constituted a breach of his fiduciary duty to Belron.

87.    As a direct and proximate result of the breach of Lee's fiduciary duty, Belron has been damaged and is entitled to recover compensatory and punitive damages.

**COUNT SEVEN**

**<u>Aiding and Abetting Breach of Fiduciary Duty</u>**

88.    Belron incorporates the allegations contained in paragraphs 1 through 87 as if fully rewritten.

89.    During her employment with Belron as a management-level employee, Levesque owed Belron a fiduciary duty.

90.    Levesque's actions in using or disclosing and/or threatening to use or disclose Belron's confidential information and in tortiously soliciting Belron's current employees to induce them to leave their employment with Belron and join her, Lee, and Levine in a competing business venture breached Levesque's fiduciary duty.

91.    Lee knew that Levesque owed Belron a fiduciary duty and that, by tortiously soliciting Belron's current employees and/or by improperly using and/or disclosing

- 16 -

and/or threatening to use or disclose Belron's trade secrets and confidential information, Levesque was breaching her duty to Belron.

92.     Lee knowingly and substantially participated in Levesque's breach of his fiduciary duty by assisting her in tortiously soliciting Belron's current employees to violate their contractual obligations to Belron and/or by disclosing and/or threatening to use or disclose Belron's trade secrets and confidential information.

93.     As a direct and proximate result of Lee aiding and abetting Levesque's breach of her fiduciary duty, Belron has been damaged and is entitled to recover compensatory and punitive damages.

## COUNT EIGHT

### Civil Conspiracy to Tortiously Interfere with Contracts and Misappropriate Trade Secrets

94.     Belron incorporates the allegations contained in paragraphs 1 through 93 as if fully rewritten.

95.     Lee and Levesque planned to open a competing business venture in violation of Lee's Employment Agreement.

96.     In furtherance of that competing venture, Lee and Levesque acted in concert and pursuant to an agreement to solicit current Belron employees to leave their employment and join them in that competing venture.

97.     Lee and Levesque acted without privilege and/or justification in interfering with Belron's employees' contracts.

98.     In furtherance of that conspiracy, and in violation of Lee's Employment Agreement and their common law duties to Belron, Lee and Levesque actively and repeatedly

- 17 -

solicited current Belron employees in order to tortiously interfere with their contractual obligations with Belron.

99.    In furtherance of that conspiracy, Lee and Levesque have used and/or threatened to misappropriate Belron's trade secrets.

100.    As a result of Lee's conduct, Belron has and will continue to suffer damages and irreparable harm.

WHEREFORE, Belron prays that the Court enter judgment in its favor providing the following relief:

A.    Imposing temporary, preliminary, and permanent injunctions enjoining Lee from breaching the terms of his Employment Agreement with Belron by soliciting or employing Belron's current employees and/or by using or disclosing Belron's trade secrets, and from conspiring to carry out these activities.

B.    Awarding compensatory damages against Lee for his breach of his Employment Agreement.

C.    Awarding compensatory and punitive damages against Lee for his misappropriation of Belron's trade secrets and confidential business information.

D.    Awarding compensatory and punitive damages against Lee for his tortious interference with Belron's contracts.

E.    Awarding compensatory and punitive damages against Lee for his breach of the duty of good faith and loyalty to Belron;

F.    Awarding compensatory and punitive damages against Lee for his breach

of fiduciary duty to Belron;

G.    Awarding Belron attorneys' fees, costs, and disbursements of this action;

and

H.    Awarding Belron such other and further relief as the Court deems just and

proper.

## **JURY DEMAND**

**Plaintiff requests a trial by jury on all issues so properly tried.**

Respectfully submitted,

_____

Paul E. Svensson (3403)
George S. Hodges (4573)
Hodges Walsh and Slater
55 Church Street, Suite 211
White Plains, New York 10601
914-385-6000(office)
914-385-6060(fax)
ghodges@hwslaw.com
psvensson@hwslaw.com
Attorneys for Plaintiff,
Belron US, Inc.

**OF COUNSEL:**
William G. Porter II (0017296)
Robert A. Harris  (0059549)
Michael C. Griffaton  (0062027)
Thomas Fusonie (0074201)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio  43216-1008
(614) 464-6400 Telephone
(614) 464-6350 Facsimile
Attorneys for Plaintiff,
Belron US, Inc.

## VERIFICATION

Brett Decker, being duly cautioned and sworn, states that he is a duly authorized representative of Belron US, Inc. and that all allegations contained in the Verified Complaint are in good faith believed to be true and accurate.

Belron US, Inc.

By: _____
Brett Decker

Sworn to before me on this _15_ day of _August_, 2008.

_____
Notary Public

_____
My Commission Expires

NOTARIAL SEAL
HOLLY F METCALF
Notary Public
KINGSTON TWP, LUZERNE COUNTY
My Commission Expires Nov 3, 2010

- 20 -



# VORYS

**Vorys, Sater, Seymour and Pease LLP**
Legal Counsel

62 East Gay St.
PO Box 1008
Columbus, OH 43216-1008
614.464.6400

*www.vorys.com*

Founded 1909

William G. Porter, II
Direct Dial (614) 464-5446
Facsimile        (614) 719-4911
E-Mail - wgporter@vorys.com

August 1, 2008

**VIA OVERNIGHT CARRIER**

Mr. Edward Lee
35 Larch Court
Fishkill, NY 12524

        Re:    Belron US Inc./Diamond
                  Restrictive Covenants and Confidentiality Obligations

Dear Mr. Lee:

        This law firm represents Belron US Inc. ("Belron"). I write to confirm that your employment with Belron terminated on July 30, 2008 and to advise you that your non-compete, non-solicitation and confidentiality obligations as set forth in Section 4 of your Employment Compensation Agreement and Agreement Not to Disclose Confidential Information ("Agreement") remain in full force and effect. A copy your Agreement is attached hereto.

        Belron has learned that you repeatedly violated Section 4 of your Agreement, including your non-compete and non-solicitation obligations, which in pertinent part and without limitation expressly prohibits you from:

        (I) directly or indirectly…compet[ing] with the business of [Belron];

        (II) becom[ing] an employee or perform[ing] services in any capacity for any person or business…that competes with…[Belron];

        (III) directly or indirectly hav[ing] an ownership interest of any kind or any interest of any kind in the revenue or business entity which competes with the business…;

        (IV) do[ing] business with any customer of [Belron], solicit[ing], divert[ing] or attempt[ing] to divert from the Company any customer or business;

**WASHINGTON**
1828 L St. NW
Eleventh Floor
Washington, DC 20036-5109
*202.467.8800*

**CLEVELAND**
1375 East Ninth St.
2100 One Cleveland Center
Cleveland, OH 44114-1724
*216.479.6100*

**CINCINNATI**
221 East Fourth St.
Suite 2000, Atrium Two
PO Box 0236
Cincinnati, OH 45201-0236
*513.723.4000*

**ALEXANDRIA**
277 South Washington St.
Suite 310
Alexandria, VA 22314
*703.837.6999*



**EXHIBIT**

A



**VORYS**
Legal Counsel

Mr. Edward Lee
August 1, 2008
Page 2

      (V) call[ing]-on, solicit[ing] or contact[ing] any potential customer [you] called on, solicited or contacted while employed with [Belron]; or

      (VI) solicit[ing] or attempt[ing] to solicit any associate of [Belron] or employ[ing] any person employed by [Belron].

      Please be advised that you are to **cease and desist** immediately any and all conduct which is in violation of the terms and conditions of your Agreement, including, but not limited to, the prohibited conduct set forth in Section 4 and outlined above. Belron has instructed us to pursue all legal remedies available to the Company, including (if necessary) the initiation of legal action against you.

      Finally, to the extent that you have any confidential or proprietary documents or property of Belron in your possession, custody, or control, you must return those items to Belron immediately.

      Very truly yours,

      William G. Porter, II

WGP/crm
Enclosure



January 20, 2006

Mr. Ed Lee
35 Larch Court
Fishkill, NY 12524

Dear Ed:

Diamond Triumph Auto Glass, Inc. is pleased to offer you the position of Director of Retail Initiatives at your current salary with an opportunity to earn additional bonus to be determined.

Your new responsibilities will encompass the following initiatives:

- The $5 (m) yellow page program in where you will be responsible for the placement in all markets nationwide. In addition, the further analysis of all yellow page placements to deem their effectiveness in the 250 markets. This specific responsibility will require the day- to -day management of Ann Marie Yurish.
- Analysis and review of all real estate locations nationwide from a location and appearance standpoint including signage. This initiative will require you to work with senior management to determine a uniform platform for all locations across the country. In addition, during this ongoing review and analysis, management would want you to develop a proposal for standardized employee uniforms from a retail standpoint.
- Spearhead a fuel cost reduction initiative in where fuel cost will be reviewed, analyzed, and action items initiated to reduce fuel costs.
- Participation on the Mergers and Acquisition team. This responsibility will require you to analyze and evaluate any potential acquisitions from an operations perspective. If an acquisition takes place, you would be part of the implementation team. You would also be responsible for the company's plan to capture market share though strategic plans targeting our major competitors.

We believe that this offer is comprehensive and recognizes your considerable skills and abilities. We are confident that you will find this new role and opportunity to prosper and grow and make a significant contribution.

Please accept our congratulations. We are looking forward to having you on our team in this new capacity.

220 Division Street, Kingston, PA  18704 ~ 1-800-999-2688

**EXHIBIT**

B

Please acknowledge your acceptance of this offer by signing below and returning to me by Wednesday, February 15, 2006.   Again, if you have any questions, please feel free to contact me at 1-800-999-2688, extension 3150.

Sincerely,


Doug Boyle
President - Chief Operations Officer


**PLEASE SIGN BELOW IN ACCEPTANCE OF OFFER**
*This written communication is intended solely to memorialize the terms of your offer of at-will employment and should not be construed as an employment agreement for a specified employment term.*

_____
Signature

1-23-06
_____
Date


220 Division Street, Kingston, PA  18704 ~ 1-800-999-2688

30015
ent
8/8/06

# EMPLOYMENT COMPENSATION AGREEMENT
## AND
## AGREEMENT NOT TO COMPETE, SOLICIT AND DISCLOSE CONFIDENTIAL INFORMATION

This is an Agreement Between Diamond Triumph Auto Glass, Inc. (the "Company")
And Edward Lee (the "Associate").

1. <u>Background.</u>    Diamond Triumph Auto Glass, Inc., is in the business of distributing, selling and installing glass for all types of vehicles and other non-automotive applications along with certain accessories and ancillary products.  The Company has developed and uses in its business certain processes, methods and systems, sources of supply, and sales and marketing techniques and has customer lists, files, records, pricing information, sales plans, business plans and other business information that are confidential and proprietary that are valuable and useful in its business and enable it to operate successfully (such information is collectively referred to in this Agreement as the "Diamond Triumph System").   In the course of his employment, the Company has disclosed to the Associate certain parts of the Diamond Triumph System and will disclose to the Associate more of the Diamond Triumph System and improvements thereto in the future. The Company and the Associate are entering into this Agreement to provide reasonable restrictions on (i) the Associate's activities that compete with the business of the Company, (ii) the disclosure of any part of the Diamond Triumph System, whether now known by the Associate or hereafter disclosed, to persons who are not employees of the Company, and (iii) the use of the Diamond Triumph System by the Associate other than in the business of the Company.  It is understood and agreed, however, that the restrictions set forth in section 4B shall not apply to information obtained by the Associate prior to his employment by the Company or that is or becomes generally through no fault of the Associate.

2.  <u>Necessity for Agreement.</u>   The Associate acknowledges and agrees that the Diamond Triumph System is a valuable business asset; that there are significant and necessary reasons for entering into this Agreement; and that this Agreement is necessary to protect the legitimate interest of the Company.

3.   <u>Consideration for Agreement</u> - The consideration to the Associate for this Agreement is a weekly salary increase in the amount of $383.07 per week.

4. <u>Restrictive Covenants.</u>

    A. <u>Agreement Not to Compete.</u>  During the term of the Associate's employment by the Company and for a period of twelve (12) months after termination of such employment, regardless of whether such termination is voluntary or involuntary, or with or without cause, the Associate shall not (i) directly or indirectly, for himself or any other person or business entity, compete with the business of the Company; (ii) become an employee of or perform services in any capacity for any person or business entity that competes with the business of the Company; (iii) directly or indirectly have an ownership interest of any kind or any interest of any kind in the revenue or business entity which competes with the business, except that the provisions of this clause shall not be applicable to an investment by customary channels in stock that is publicly traded that does not exceed five percent (5%) of the total amount of such securities outstanding;

Employment Compensation Agreement
And Agreement Not to Compete, Solicit    and
Disclose Confidential Information

EXHIBIT
C

(IV) do business with any customer of the Company, solicit, divert or attempt to divert from the Company any customer or business whatsoever; (V) call-on, solicit or contact any potential customer Associate called-on, solicited or contacted while employed with Company during the last twelve months of employment with Company; or (VI) solicit or attempt to solicit any associate of the Company or employ any person employed by the Company. For purposes of this section 4A, the Associate shall be deemed to be competing with the business of the Company if the Associate is engaged in any way in the business of selling, repairing or installing automobile or truck glass or windshields or other glass products, or selling and installing those kinds of automobile and truck accessories sold by the Company either during, at or after the time of the termination of the Associate's employment.

B. Agreement Not to Disclose Confidential Information. The Associate shall not at any time, during or after the term of the Associate's employment by the Company, disclose, declare, or reveal to any person, or in any way use for Associate's own profit, gain, or benefit, all or any part of the Diamond Triumph System, which the Associate acknowledges for purposes hereof consists of all information regarding the business methods, systems, processes, business plans, customers, pricing, costs, sources of supply, and other information about the products, customers, suppliers, marketing plans and business of the Company. It is understood and agreed, however, that the restrictions set forth in this section 4B shall not apply to any part of the Diamond Triumph System that was known to the Associate prior to his employment by the Company or that is or becomes generally known within the automotive replacement industry through no fault of the Associate.

C. Scope of Restrictive Covenants. The Associate shall not engage in any competitive activity prohibited by section 4A within the United States.

D. Reasonableness. The Associate acknowledges that the period of restriction and geographic areas of restriction imposed by the provisions of this Agreement are fair and reasonable and are reasonably required for the protection of the Company. In the event that any of the provisions of this Agreement relating to the geographic area of restriction or the period of restriction shall be determined by a court of competent jurisdiction to exceed the maximum area or period of time that such court would deem enforceable, the geographic area of restriction and the period of restriction shall, for the purpose of this Agreement, be reduced to the maximum area or period that such court would deem valid and enforceable.

5. Remedies. The Associate hereby acknowledges and confirms that the breach of this Agreement would cause immediate and irreparable injury, loss, and damage to the Company and that an adequate remedy at law for such injury, loss, or damage may not exist. Therefore, the Associate agrees that, in the event of any such breach, the Company shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and permanent injunctive relief or enforce any provision hereof, without the necessity of proof of actual injury, loss, or damage or notice to the Associate. No remedy conferred upon the Company by this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing in law, in equity, or by statute. The non-compete period of Section 4A above shall be extended for such period that the Associate is in breach of the provisions of this Agreement such that the Company has the benefit of the full twelve month non-compete period.

6. Employment-at-Will. This Agreement is not intended to create, and should not be interpreted to create, an employment contract for any specific period of time between the Company and the Associate. Regardless of any statement contained in the Agreement, the Company has the right to terminate the Associate's employment at any time, for any reason, with or without cause or notice. The Associate and the Company acknowledge that the Company reserves the right to adjust the Associate's responsibilities, as deemed necessary by business factors including, but not limited to changes in the Associates workload and branch responsibilities.

7. Severability. If any of the covenants contained herein or any part thereof are hereafter construed to be invalid or unenforceable, the remainder of this Agreement and any application of the other provisions of this Agreement shall not be affected thereby, but rather shall be enforced to the fullest extent permitted by law. In the event that a court of competent jurisdiction determines that any provision of this Agreement is unenforceable as a matter of law, such provision shall be construed by modifying it so as to be enforceable to the extent compatible to then applicable law.

8. Entire Agreement. This Agreement contains the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements or understandings, written or oral, with respect to such subject. This Agreement may not be changed orally and may be amended only by an agreement in writing signed by both parties hereto. This Agreement may be assigned by Company without the consent of Associate to any affiliate, subsidiary, parent, or successor to Company, whether such successor is by merger, asset sale, stock purchase sale or other means.

The laws of the state of New York shall govern the validity, interpretation, construction and enforcement of this agreement.

        IN WITNESS WHEREOF, this Agreement is executed by the undersigned as of the date set forth below.

THE ASSOCIATE:                          DIAMOND TRIUMPH AUTO GLASS, INC.

Signature: _____            By: _____ - Keith Wisley

Name: EDWARD J. LEE                     Title: VP, HR & RM

Date: 5-6-06                            5/15/2006

Witnesseth: Michelle Lee
Form HR-017



November 23, 2005

Ms. Michelle Levesque
547 Stafford Road
Fall River, MA  02721

Dear Michelle:

Diamond Triumph Auto Glass, Inc. is pleased to offer you the position of Director of Best
Practices – Operations, with a new annual salary of $80,000.00 with an opportunity to earn
additional bonus based on objectives to be determined.

We believe that this offer is comprehensive and recognizes your considerable skills and abilities.
We are confident that you will find this new role and opportunity to prosper and grow and make
a significant contribution.

Please accept our congratulations.  We are looking forward to having you on our team in this
new capacity.

Please acknowledge your acceptance of this offer by signing below and returning to me by
Wednesday, November 30, 2005.  Again, if you have any questions, please feel free to contact
me at 1-800-999-2688, extension 3150.

Sincerely,

*Karen Christopher*

Karen Christopher
Vice President, Chief Administrative Officer

**PLEASE SIGN BELOW IN ACCEPTANCE OF OFFER**
*This written communication is intended solely to memorialize the terms of your offer of at-will
employment and should not be construed as an employment agreement for a specified
employment term.*

*Michelle Levesque*
Signature

11-26-05
Date

220 Division Street, Kingston, PA  18704 ~ 1-800-999-2688



EXHIBIT

D

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                )
                                      )   Chapter 11
DIAMOND GLASS, INC., *et al.*,[1]     )
                                      )   Case No. 08-10601 (CSS)
                                      )
                    Debtors.          )   (Joint Administration Requested)
                                      )
                                      )   Ref. Docket No.: 28, 144, 187, 207,
                                      )   208, 274, 290

ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, AND 365 AND
FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014,
(A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE
OF ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS
(B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES; (C) AUTHORIZING THE
ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF

This matter having come before this Court on the *Motion For Entry Of An Order*

*Pursuant To 11 U.S.C §§ 105(A), 363 And 365 And Federal Bankruptcy Rules 2002, 6004, 6006,*

*And 9014, (A) Approving Asset Purchase Agreement And Authorizing The Sale Of Assets Of*

*Debtors Outside The Ordinary Course Of Business; (B) Authorizing The Sale Of Assets Free And*

*Clear Of All Liens, Claims, Interests And Encumbrances; (C) Authorizing The Assumption And*

*Sale And Assignment Of Certain Executory Contracts And Unexpired Leases; And (D) Granting*

*Related Relief* (the "Sale Motion", Docket No. 28)[2] filed on April 1, 2008 by Diamond Glass,

---

[1]    The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853); and DT Subsidiary
Corp., a wholly owned subsidiary of Diamond Glass (Tax ID No. XX-XXX3494), each with a mailing address of
220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies,
Inc. and Diamond Triumph Auto Glass, Inc.

[2]    All capitalized terms not defined herein shall be given the meaning ascribed to them in the Agreement, the Sale
Motion, or the Bid Procedures Order (as defined below), as appropriate.

DB02:6909977.4                              1                        066831.1001

EXHIBIT
E

Inc. ("Diamond"), and DT Subsidiary Corporation ("DT Subsidiary", and, together with Diamond, the "Debtors").

In the Sale Motion, Debtors request that the Court enter an order, among other things, (A) approving that certain Asset Purchase Agreement (the "APA") entered into or to be entered into by and between the Debtors and Diamond Glass Acquisition, LLC, or its assignee(s) or designee(s); (B) approving the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") outside the ordinary course of business and free and clear of the Encumbrances other than the Permitted Encumbrances (the "Excluded Encumbrances"), and subject to higher or better bids; (C) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases; and (D) granting related relief.

On April 24, 2008 this Court entered an order (the "Bid Procedures Order", Docket No. 187) authorizing Debtors to conduct the Auction and establishing a date for the Auction, and approving, among other things, (i) the terms and conditions of the bid procedures set forth in the Bid Procedures Order (the "Bid Procedures"), (ii) the use of the Bid Procedures in connection with the Auction; (iii) the form and manner of notice of the Bid Procedures; and (iv) procedures relating to certain Designated Contracts, including notice of proposed cure amounts.

On May 23, 2008 this Court entered a consensual order (the "Extension Order", Docket No. 274) extending certain deadlines contained in the Bid Procedures Order including the date of the Auction and the Sale Hearing.

The Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any, being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and

066831.1001

objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that notice of the Sale Motion and of the Bid Procedures are sufficient under the circumstances, and that no further notice is required; and it appearing that the relief requested in the Sale Motion is in the best interests of Debtors, their estates and creditors, and all other parties-in-interest thereof; and after due deliberation and sufficient cause appearing therefore;

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     The Court has jurisdiction over this matter and over the property of Debtors, including the Assets to be sold, transferred, or conveyed pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of June 19, 2008, by and between Debtors, and their estates pursuant to 28 U.S.C. §§ 157 and 1334, and Belron U.S. Inc. (the "Purchaser"). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this chapter 11 case and the Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are (i) sections 105(a), 363, and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

---

[3]   All findings of fact and conclusions of law announced by the Court at the Sale Hearing and related to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.

DB02:6909977.4                                                                   066831.1001

D.    On April 1, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in possession and management of their business and property as a debtor-in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.    As evidenced by the proofs of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, and the Sale Hearing have been provided in accordance with sections 102(1) and 363(b), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, the local rules of this Court, the procedural due-process requirements of the United States Constitution, and in compliance with the Bid Procedures Order. The Debtors also provided due and proper notice of the assumption, sale, and assignment of each executory contract and the unexpired leases to be assigned to Purchaser pursuant to the Agreement (the "Designated Contracts") to each non-debtor party under each such Designated Contract. Such notice was good and sufficient and appropriate under the particular circumstances. No other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Designated Contracts (including with respect to the payment by the Debtors of any cure amount due thereunder), or of the entry of this Order is necessary or shall be required other than with respect to the procedures for assumption and assignment of Real Property Leases.

F.    A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Designated Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the

4

066831.1001

Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or who were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Assets. Other parties interested in bidding on the Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets in accordance with the Bid Procedures Order and Bid Procedures.

G.    The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

H.    The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances requiring them to enter into the Agreement, sell the Assets and assume and assign the Designated Contracts under sections 105(a), 363, and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and the creditors thereof. There can be no assurance that the value of the Assets would be maintained if any undue delay in consummation of the transactions contemplated in the Sale Motion and Agreement were to occur. There can be no assurance that the Purchaser would be willing to complete such transactions if delay in the consummation of the transactions were to occur.

I.    The Bid Procedures set forth in the Bid Procedures Order were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations and were reasonable and appropriate in the context of these cases.

DB02:6909977.4                                              066831.1001

J.      The Debtors and their professionals have complied, in good faith, in all respects with the Bid Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bid Procedures Order, the Debtors (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest and/or otherwise best offer to purchase the Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Assets, (c) considered any bids submitted on or before the Bid Deadline or any extension granted in accordance with the Bid Procedures Order, and (d) commenced the Auction on June 19, 2008.

K.      At the conclusion of the Auction, the Debtors announced that they had determined that the offer submitted by the Purchaser in the Agreement was the highest and/or otherwise best offer, and the Purchaser is the Successful Bidder for the Assets in accordance with the Bid Procedures Order. The Purchaser submitted the highest and/or otherwise best offer, and the Purchaser is the Successful Bidder for the Assets in accordance with the Bid Procedures Order. The Bid Procedures therefore obtained the highest value for the Assets for the Debtors and their estates.

L.      The offer of the Purchaser, on the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest and/or best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' estates and the creditors thereof; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Assets;

DB02:6909977.4                                                              066831.1001

and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

M.    The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder. The Agreement was negotiated and entered into in good faith, based on arm's-length bargaining, and without collusion or fraud of any kind. The Auction was conducted in accordance with the Bid Procedures Order and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Based on the record before the Court, neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Assets and Designated Contracts to the Purchaser. The Purchaser is therefore entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code, including with respect to all of the Assets.

N.    The Debtors have full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Assets as contemplated by Agreement has been authorized and approved by the Debtors. Other than as may be expressly provided for in the Agreement, no consents or approvals are required by the Debtors to consummate such transactions.

O.    The Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and assign the Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Assets and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any person, the

7

transfer of the Assets to the Purchaser and the assumption and assignment of the Designated

Contracts is a legal, valid, and effective transfer of the Debtors' right, title and interest in the

Assets and any Designated Contracts upon the Closing.

      P.     The terms and conditions of the Agreement, including the consideration to be

realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions

contemplated by the Agreement are in the best interests of the Debtors' estates.

      Q.     Except as otherwise provided in the Agreement, the Assets shall be sold free and

clear of all Encumbrances with Encumbrances to attach to the net proceeds to be received by the

Debtors in the same priority and subject to the same defenses and avoidability, if any, as before

the Closing (as defined in the Agreement), and the Purchaser would not enter into the Agreement

to purchase the Assets otherwise; provided, however, that no Encumbrances shall attach to

payments made by the Purchaser, in accordance with the Agreement, to satisfy (i) any payments

to be made to NatCity pursuant to section 2.3(b)(i) of the Agreement (the "Investment Banking

Fee"), or (ii) any payments made by the Purchaser pursuant to section 2.3(b)(iii) and (iv) of the

Agreement (the "Wind Down Expenses").

      R.     The transfer of the Assets to the Purchaser will be a legal, valid, and effective

transfer of the Assets, and, except as may otherwise be provided in the Agreement, shall vest the

Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any and

all Encumbrances.  Except for the Assumed Liabilities as specifically provided in the Agreement

or this Order, the Purchaser shall not assume or become liable for any Encumbrances relating to

the Assets being sold by the Debtors.

      S.     The transfer of the Assets to the Purchaser free and clear of all Excluded

Encumbrances will not result in any undue burden or prejudice to holders of any Excluded

DB02:6909977.4

066831.1001

Encumbrances as all such Excluded Encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Assets received by the Debtors in the order of their priority, with the same validity, force, and effect that they now have as against the Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Excluded Encumbrances of any kind or nature whatsoever against or in the Debtors or the Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Excluded Encumbrances against the Purchaser, any of its assets, property, successors or assigns, or the Assets.

T.    The Debtors may sell the Assets free and clear of all Excluded Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Excluded Encumbrances and (ii) non-debtor parties, who did not object, or who withdrew their objections, to the sale of the Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Excluded Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Excluded Encumbrances, if any, attach to the net proceeds of the sale of the Assets ultimately attributable to the property against or in which they claim or may claim any Excluded Encumbrances, with such Excluded Encumbrances being subject to treatment as prescribed in the Plan filed by the Debtors or by separate order of this Court; provided, however, that no Excluded Encumbrances shall attach to payments made by the Purchaser, in accordance with the Agreement, to satisfy the Wind-Down Expenses and Investment Banking Fee. All objections to the Sale Motion have been resolved or withdrawn or overruled.

estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates.

Z.    The sale of the Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The sale does not constitute a *sub rosa* chapter 11 plan.

AA.    The Agreement is a valid and proper offer and "Qualified Bid" pursuant to the Bid Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code.

BB.    The total consideration provided under the Agreement by the Purchaser for the Assets is the highest and/or best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Assets.

CC.    Time is of the essence in consummating the sale. To maximize the value of the Assets, it is essential that the sale of the Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the 10-day stay imposed by Bankruptcy Rules 6004 and 6006.

DD.    Other than the Assumed Liabilities and its obligations under the Agreement, the Purchaser shall have no obligation with respect to any liability of the Debtors.

11

NOW, THEREFORE, BASED ON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Sale Motion is granted, pursuant to 11 U.S.C. §§ 105(a), 363, and 365, in its entirety, subject to the terms and conditions contained in this Order.

2.    All objections and responses to the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  If any such objection or response was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied.

3.    Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with 11 U.S.C. § 102(F) and Bankruptcy Rules 2002, 6004 and 6006.

*Approval of Sale*

4.    The sale of the Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), and the transactions contemplated thereby are approved in all respects.

5.    The sale of the Assets, and the consideration provided by the Purchaser under the Agreement, is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.    The Purchaser is hereby granted and is entitled to all of the protections provided to a good-faith Purchaser under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Designated Contracts as part of the sale of the Assets pursuant to section 365 of the Bankruptcy Code and this Order; accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of Assets shall not affect the validity

12

of the sale of Assets to Purchaser (including with respect to the transfer of the Designated Contracts as part of the sale of Assets pursuant to section 365 of the Bankruptcy Code and this Order), unless such authorization is duly stayed pending such appeal.

7.    The Debtors are authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement and this Order and sale of the Assets contemplated thereby including, without limitation, deeds, assignments, stock powers, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession any or all of the Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement, without any further corporate action or orders of this Court.  The parties shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to their respective obligations to do so have been met, satisfied or waived.

8.    The Debtors and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file, and record, as appropriate, such

13

other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further notice to any person, application to, or order of, the Court or further action by their respective directors, officers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, agents, representatives, and attorneys of such entities. The officers, directors, or any other authorized representative of the Debtors are authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated limited-liability-company agreements, certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any officer of the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action is deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the state of Delaware and all

066831.1001

other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

9.    Effective as of the Closing, (a) the sale of the Assets by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Debtors' right, title and interest in the Assets notwithstanding any requirement for approval or consent by any person and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets, free and clear of all Excluded Encumbrances of any kind, pursuant to sections 363(f) and (b) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Purchaser shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

10.    The sale of the Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

*Transfer of Assets*

11.    Except to the extent specifically provided in the Agreement, upon the closing of the sale pursuant to the Agreement, the Debtors are authorized, empowered, and directed, pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, to sell the Assets, including those within the Assignment and Assumption Agreement, to the Purchaser. The sale of the Assets shall vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any and all Excluded Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or

15

otherwise, with all such Excluded Encumbrances to attach only to the proceeds of the sale (if any) with the same priority, validity, force, and effect, if any, as they now have in or against the Assets, subject to all claims and defenses the Debtors may possess with respect thereto; provided, however, that no Excluded Encumbrance shall attach to payments made by the Purchaser, in accordance with the Agreement, to satisfy the Wind-Down Expenses and Investment Banking Fee. Following the date of such closing, no holder of any Excluded Encumbrances in the Assets shall interfere with the Purchaser's use and enjoyment of the Assets based on or related to such Excluded Encumbrances, or any actions that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent, interfere with, or otherwise enjoin consummation of the transactions contemplated in or by the Agreement or this Order.

12.    The provisions of this Order authorizing the sale of the Assets free and clear of Excluded Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order. However, the Debtors and the Purchaser, and each of their respective officers, employees, and agents, are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order. Moreover, effective as of the Closing Date, the Purchaser, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time

16

to institute and prosecute in the Debtors' name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, that the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets, and to do all acts and things with respect to the Assets that the Purchaser, its successors and assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are irrevocable by the Debtors.

13.    If any person or entity, which has filed statements or other documents or agreements evidencing Excluded Encumbrances on or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Excluded Encumbrances, and any other documents necessary for the purpose of documenting the release of all Excluded Encumbrances which the person or entity has or may assert with respect to the Assets, the Debtors and Purchasers are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

14.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been and are directed to be transferred to the Purchaser as of the Closing Date.

15.    All of the Debtors' rights, title and interests in the Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date, or at such other time as specified pursuant to the terms of the Agreement, and upon the occurrence of the Closing, or at

DB02:6909977.4                                                              066831.1001

such other time as specified pursuant to the terms of the Agreement, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, or at such other time as specified pursuant to the terms of the Agreement, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Assets acquired by the Purchaser under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Purchaser.

16.    Except for the Assumed Liabilities as expressly provided in the Agreement, the Purchaser is not assuming nor shall it or any affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement. Except for the Assumed Liabilities, all of the Debtors' liabilities, debts, and obligations arising prior to the Closing Date are extinguished insofar as they may give rise to liability, successor, vicarious or otherwise, against the Purchaser or any affiliate of the Purchaser and their respective officers, directors and advisors.

17.    Except as otherwise provided in the Agreement, on the Closing Date, each creditor of the Debtors is authorized to execute such documents and take all other actions as may be necessary to release its Excluded Encumbrances in and against the Assets, if any, as may have been recorded or may otherwise exist.

18.    Except as otherwise expressly provided in the Agreement, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Assets are directed

:18

to surrender possession of the Assets to the Purchaser on the Closing Date or at such time
thereafter as the Purchaser may request.

*Designated Contracts and Real Property Leases*

19.    The Assignment and Assumption Agreement is valid and binding, in full force
and effect, and enforceable in accordance with its terms.

20.    Subject to the terms of the Agreement, the Assignment and Assumption
Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the
Designated Contracts and the sale and assignment of such agreements to the Purchaser, as
provided for or contemplated by the Agreement, is authorized and approved pursuant to sections
363, 365, 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.

21.    The procedures (the "Lease Procedures") set forth in § 7.6 of the Agreement, for
the assumption and assignment of Real Property Leases, as defined in the Agreement, and the
form of sublease agreement attached as an exhibit to the Agreement, are hereby approved and the
Debtors are hereby authorized and directed to exercise the renewal options as set forth in the
Agreement. Upon the designation by Purchaser of a Real Property Lease or any Seller Contracts
related to such Leases as a Designated Contract in accordance with the Lease Procedures, such
Real Property Lease and Seller Contract shall be deemed to be a Designated Contract for all
purposes under this Order. After the Debtors receive written notice of such designation, the
Debtors shall file promptly a motion seeking approval of the assumption and assignment of such
Real Property Lease or any Seller Contracts related to such Leases. In addition to the foregoing,
the Debtors shall use commercially reasonable efforts to obtain an order of the Bankruptcy Court
extending their time to assume or reject Real Property Leases and Seller Contracts through
October 28, 2008.

19

066831.1001

22.     The Designated Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Purchaser at the Closing, or at such other time as specified pursuant to the terms of the Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to (a) the payment of all cures and/or other payments or actions required to assume and assign the Designated Contracts to the Purchaser; and (b) the Purchaser's right to exclude Designated Contracts from the definition of Designated Contracts in accordance with the terms of the Agreement. The Purchaser shall be liable for all obligations under such assumed and assigned Designated Contracts arising on and after the Closing Date, or at such other time as specified pursuant to the terms of the Agreement.

23.     Upon the Closing, or at such other time as specified pursuant to the terms of the Agreement, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested the Debtors' right, title and interest of each Designated Contract. The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

24.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, the Debtors shall promptly pay or cause to be paid to the parties to any Designated Contracts the requisite Cure Amounts, if any, set forth in the notice served by the Debtors on each of the parties to the Designated Contracts, except to the extent that a cure amount was amended on the record of the Sale Hearing (the "Cure Amounts"), following the assumption and assignment thereof. The Cure Amounts are fixed at the amounts set forth in the notice served by the Debtors, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-debtor parties to the Designated Contracts are forever bound by such Cure Amounts.

DB02:6909977.4                                                         066831.1001

25.    All defaults or other obligations under the Designated Contracts that are being assumed and assigned to the Purchaser arising prior to the Closing, or at such other time as specified pursuant to the terms of the Agreement, (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Amounts.

26.    Any provision in any Designated Contract that purports to declare a breach, default, or payment right as a result of a sublet, assignment or a change of control in respect of the Debtors is unenforceable and is hereby nullified with respect to the sale transaction and procedures for delayed assumption of real property leases set forth in the Agreement and assignments authorized by this Order, and all Designated Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amounts, if any.  No sections or provisions of any Designated Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor third party to the Designated Contracts or restrict use of the premises which are demised by a Designated Contract to a specific named tenant, business or use shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Designated Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Designated Contract.  The non-Debtors party to each Designated Contract shall be deemed to have consented to such assignment under section 365(e)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Designated

21

Contract as of the applicable date of assumption without the necessity of obtaining such non-Debtors party's written consent to the assumption or assignment thereof.

27.    Purchaser, its successors and assigns, shall have the express right to exercise any and all unexercised extension options, renewal options, and/or non-disturbance rights or protections, notwithstanding any language in the Designated Contracts making the exercise of such rights personal to any party or limiting the exercise of such rights only to an assignee who is an affiliate of the original named party under such Designated Contract or an entity that acquires all or substantially all of the assets of the original named party to such Designated Contract. Purchaser shall exercise said rights consistent with the terms of any such Designated Contract.

28.    The Purchaser has satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Designated Contracts. The Purchaser shall be responsible for all post-Closing liabilities and obligations under the Designated Contracts.

29.    The Debtors and their estates shall be relieved of any liability for any breach of any of the Designated Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

*Additional Provisions*

30.    The Purchaser has not assumed or is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the Agreement, and the Purchaser has not purchased any of the Excluded Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Encumbrances based on or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against the Purchaser (or its affiliates) or the Assets to recover any Encumbrances or on account of any liabilities of the Debtors other than Assumed Liabilities

22

pursuant to the Agreement. All persons holding or asserting any Encumbrances in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances or cause of action against the Purchaser or the Assets for any liability associated with the Excluded Assets.

31.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtors and/or their estates including, ~~without limitation, any bulk-sales law, successor or vicarious liability or similar liability except~~ as otherwise expressly provided in the Agreement. Except to the extent the Purchaser assumes the Assumed Liabilities pursuant to the Agreement, neither the purchase of the Assets by the Purchaser or its affiliates or designees, nor the fact that the Purchaser or its affiliates or its designees are using any of the Assets previously operated by the Debtors, will cause the Purchaser or any of its affiliates or designees to be deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products-liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product-warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Except to the extent expressly included in the Assumed Liabilities, the Purchaser and its affiliates shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 210 *et seq.*) or the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state, or local labor, employment, or environmental law by virtue of the Purchaser's purchase of the Assets or assumption of the Assumed Liabilities.

32.     Except to the extent expressly included in the Assumed Liabilities, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all persons and entities, including, without limitation, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax, and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding any Excluded Encumbrance, of any kind or nature whatsoever against, in or with respect to the Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Excluded Encumbrance against the Purchaser or any affiliate, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Assets.  To avoid doubt, the foregoing shall not prevent the Debtors, their estates, successors, or permitted assigns from pursuing claims, if any, against the Purchaser and/or its successors and assigns in accordance with the terms of the Agreement.

33.     Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates the Agreement and any related agreements.

24

066831.1001

concerning this Order, the Agreement, or the rights and duties of the parties hereunder or

thereunder or any issues relating to the Agreement and this Order including, without limitation,

the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature,

and extent of the Assets and any Designated Contracts and all issues and disputes arising in

connection with the relief authorized herein, inclusive of those concerning the transfer of the

assets free and clear of all Excluded Encumbrances. To the extent there are any inconsistencies

between the terms of this Order and the Agreement, the terms of this Order shall control.

46.    Notwithstanding anything to the contrary in this Order, any assignee of the Motor

Vehicle Fleet Open-End Operating Lease Agreement No. 2241, dated April 22, 2002, as

amended by the Lease Security Amendment dated May 30, 2002 (collectively, the "Vehicle

Lease"), referenced in the *Limited Objection And Reservation Of Rights Of D. L. Peterson Trust*

*With Respect To Debtor's Motion For Entry Of Order Approving Assumption And Assignment*

*Of Certain Contracts, And Notice Of Proposed Cure Amounts* [Docket No. 288] (the "Limited

Objection") filed by D. L. Peterson Trust ("DLPT"), shall be responsible for all obligations of

the lessee under the Vehicle Lease including, without limitation, any tort or similar claims

asserted by third parties or claims asserted by any taxing authorities, regardless whether such

obligations relate to any period of time or portion of any period of time occurring prior to

assignment of the Vehicle Lease as authorized by this Order. In connection with the foregoing,

DLPT hereby represents that, other than as set forth in the Limited Objection, it is not, as of the

date of this Order, aware of any such third party claim or any tax claim, and that there are

currently no amounts due and owing under the Vehicle Lease.

47.    Nothing in this Order or the Agreement (including but not limited to paragraph

2.4(b)(iv) thereof) releases, nullifies, precludes, or enjoins the enforcement of any liability to a

27

federal governmental unit of the United States under police and regulatory statutes or regulations against any entity as the operator of property (it being understood that none of the Assets is real estate owned and therefore owner liability is not applicable) after the date of entry of this Order; provided, however, that the Purchaser and its successors, subsidiaries, affiliates, agents and assigns shall have no liability whatsoever to any governmental units or entity or third-party, including any liability for investigation, remediation, monitoring or natural resource damages, (i) arising out of or relating to the generation, transport, or arranging for transport, recycling, handling, treatment, storage, disposal or release of wastes, substances or materials to or at any third-party location prior to the Closing Date or (ii) for any fines or penalties for any days, prior to the Closing Date, of a violation of or non-compliance with environmental, health or safety laws by the Debtors, their predecessors, subsidiaries, affiliates or agents or with respect to the Assets purchased pursuant to the Agreement. Nothing in this Order is, or shall be deemed or construed to be, an admission of liability by the Debtors under either of the immediately foregoing subclauses (i) and (ii) of this paragraph.

48.    Notwithstanding section 363(o) of the Bankruptcy Code, if, pursuant to the transactions contemplated hereby, the Purchaser purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), then the Purchaser shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as the Purchaser would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under section 363 of the Bankruptcy Code.

28

49.    Pursuant to their bid, Newport/Levine Acquisition, LLC ("NLA LLC") is the backup bidder to the Purchaser's successful bid to acquire the Assets pursuant to the Agreement, and NLA LLC shall be obligated to close on and be bound by the terms of their backup bid if the Debtors and the Purchaser shall fail to close on the sale of the Assets by the outside date set forth in the Agreement.  In such event, the Debtors and NLA LLC will submit to the Court a further order authorizing the Debtors to consummate and close the sale with NLA LLC pursuant to the terms of the backup bid and subject to all the terms and conditions thereof.

Dated: June 20, 2008
Wilmington, Delaware

Christopher S. Sontchi
United States Bankruptcy Judge

DB02:6909977.4

066031.1001